Andrew D. La Fiura (PA 307891)
andrew.lafiura@jacksonlewis.com
Cynthia S. Sandoval (SBN 191390)
sandovac@jacksonlewis.com
Vandan Kapur (SBN 281773)
vandana.kapur@jacksonlewis.com
JACKSON LEWIS P.C.
5000 Birch Street, Suite 5000
Newport Beach, California 92660
Tel: (949) 885-1360
Fax: (949) 885-1380

Attorneys for Defendants
QUALITY SYSTEMS, INC. and NEXTGEN
HEALTHCARE INFORMATION SYSTEMS, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | | |
|---|---|---|
| TRACI WOLBERT, | ) | **CASE NO.: SACV16-00009 (JLSx)** |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DECLARATION OF ANDREW D.** |
| vs. | ) | **LA FIURA IN SUPPORT OF** |
| | ) | **DEFENDANTS' MOTION TO** |
| QUALITY SYSTEMS, INC. NEXTGEN | ) | **TRANSFER VENUE** |
| HEALTHCARE INFORMATION | ) | |
| SYSTEMS, and DOES 1 through 10, | ) | Complaint Filed:   December 3, 2015 |
| INCLUSIVE, | ) | Trial Date:           None Set |
| | ) | |
| Defendants. | ) | |
| | ) | |

I, Andrew D. La Fiura, being duly sworn, declare and state as follows:

1. I am one of attorneys representing Defendants Quality Systems, Inc. ("QSI") and NextGen Healthcare Information Systems, LLC ("NextGen") in this matter. I submit this declaration in support of Defendants' Motion to Transfer Venue. The following is based on my personal knowledge, and my knowledge based on my review of and

familiarity with the pleadings, orders, and correspondence relating to the above-captioned matter.   If called as a witness, I could and would competently testify to the facts contained herein.

2.     Attached as Exhibit 1 is a true and accurate copy of the Declaration of Traci Wolbert, which was submitted in Plaintiff in connection with Case No. 8:15-cv-00550.

3.     Attached as Exhibit 2 is a true and accurate copy of Plaintiff's Confidentiality Agreement.

4.     Attached as Exhibit 3 is a true and accurate copy of the Declaration of Steve Puckett, which was submitted in connection with Case No. 8:15-cv-00550.

5.     Attached as Exhibit 4 are excerpts from the February 17, 2015 investigation report of Matthias Wagener.

6.     Attached as Exhibit 5 is a true and accurate copy of the Declaration of Jane Kurcon, which was submitted in connection with Case No. 8:15-cv-00550.

7.     Attached as Exhibit 6 is a true and accurate copy of the Affidavit of Ben Mehling.

8.     Attached as Exhibit 7 are true and accurate copies of tables reflecting the case loads of the Central District of California and the Eastern District of Pennsylvania and an explanation of terms, which were accessed on February 23, 2016 through the United States Courts website at http://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2015/06/30-3.

I swear under penalty of perjury and the laws of the United States and California that the foregoing is true and correct to the best of my knowledge and belief.

Sworn to this 23rd day of February, 2016, at Philadelphia, Pennsylvania.

_____
Andrew D. La Fiura

4815-3510-0462, v. 1

# Exhibit 1

SHARON R. VINICK, ESQ., State Bar No. 129914
sharon@levyvinick.com
LEVY VINICK BURRELL HYAMS LLP
180 Grand Avenue, Suite 1300
Oakland, CA 94612
Tel.:   (510) 318-7700
Fax:    (510) 318-7701

PATRICIA PIERCE, ESQ., State Bar No. 175646
p.pierce@gpeff.com
GREENBLATT PIERCE ENGLE FUNT & FLORES
123 S. Broad Street, Suite 2500
Philadelphia, PA 19109
Tel:   (215) 735-1600
Fax:   (215) 735-1660

Attorneys for Plaintiff TRACI WOLBERT

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| TRACI WOLBERT,<br><br>    Plaintiff,<br><br>    vs.<br><br>QUALITY SYSTEMS, INC.,<br>NEXTGEN HEALTHCARE<br>INFORMATION SYSTEMS, and<br>DOES 1 through 10, INCLUSIVE.<br><br>    Defendants. | Case No. CV-8:15-cv-00550-JLS-RNB<br><br>[Assigned to the Hon. Josephine L. Staton, Courtroom 10A; Magistrate Judge Robert N. Block, Courtroom 6D]<br><br>DECLARATION OF TRACI WOLBERT IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER VENUE<br><br>DATE:        November 13, 2015<br>TIME:        2:30 p.m.<br>CRTRM:     10A |

1

I, TRACI WOLBERT, hereby declare and state as follows:

1.  I am a party to this action. I have personal knowledge of the facts below, and if called and sworn as a witness herein, I could and would testify competently to such facts

2.  In 2002, when I was hired by NextGen, I lived in Long Beach, California. Thereafter, I moved to Santa Ana, California, which was near the NextGen headquarters. I remained in California until 2007.

3.  I started working with NextGen's sales team on June 3, 2002 and was assigned to the Southern California region. At the time of my hire, I signed an employment contract, a copy of which is attached hereto as Exhibit A. I was living in California when I signed the Employment Contract.

4.  At the time of my hire I also signed an Employee Confidential Information Agreement, a copy of which is attached hereto as Exhibit B. I was living in California when I signed the Employee Confidential Information Agreement.

5.  I do not remember signing additional agreements governing the terms of my employment during my employment with NextGen.

6.  From 2002 to 2007, while I lived in California, I was treated as a remote employee and worked from home. During this period, I worked with clients in California.

7.  Eight years ago, I moved to Pennsylvania. As was the case when I was located in California, I was considered a "remote" employee and primarily worked out of my house. Even after relocating, I continued to work with clients in California. I also traveled to California to meet with and service clients.

8.  Several years ago, QSI consolidated regional Human Resources offices into a single unit located in Irvine. To the best of my knowledge, no HR

2

documents, nor any documentation related to my complaint, the resultant investigation, nor my termination are held in Horsham.

9.   I believe Sheldon Razin, Chairman of the QSI's Board of Directors, lives in California.

10.   I believe Mattias Wagener, the independent investigator hired by QSI to investigate my harassment complaints, lives in California.  His investigation was conducted from California, where I met with him to discuss my complaints on . November 6, 2014.

11.   I traveled to California to meet with Mattias Wagener.  I was accompanied to this meeting by my lawyer, Ronald Greenblatt.  Pat Pierce did not travel to California for this meeting.

12.   To date I regularly travel to California for work and to visit with friends and family who live primarily in Irvine, California.

13.   I am prepared to travel to California to participate in depositions, trial, and any other event that may require my attendance.

I declare under penalty of perjury under the laws of the State of Pennsylvania that the foregoing is true and correct and that this declaration was executed in Philadelphia, Pennsylvania, on October 22, 2015

_____
Traci Wolbert

3

# EXHIBIT A

EXHIBIT A
4

May 29, 2002

Ms. Traci L. Wolbert
43 Ximeno Avenue #1
Long Beach, CA 90803

Dear Ms. Wolbert:

The NextGen Healthcare division of Quality Systems, Inc. is pleased to offer you the full-time position of Sales Representative. The specifics of our offer are set forth below:

| | |
|---|---|
| <u>Starting Salary</u>: | $55,000.00 per annum |
| <u>Starting Date</u>: | June 10, 2002 |
| <u>Commission</u>: | In accordance with FY2003 Commission Plan attached; commissions to be paid in accordance with Company's then current commission policy. |
| <u>Car Allowance</u>: | $300.00 per month, plus 12 cents per business mile. |
| <u>Vacation Days</u>: | You are entitled to accrue 80 hours vacation (2 weeks) at the rate of 6.66 hours/month during your first year with the Company. After one year with the company, you will be eligible for two weeks vacation to be taken in accordance with existing company policy. |
| <u>Standard Benefits</u>: | On your first day of work, you will be provided with access to the electronic version of the Employee Procedure Manual, which outlines the standard benefits and additional terms and conditions that will be applicable to your employment with Company. |

To formally indicate your acceptance of our offer, please sign and date a copy of this letter and return it, along with the executed Confidentiality Agreement, to my attention. After first calling the number listed below, please also fax an executed copy to Patti Christiansen's attention at 215-657-2986.

We are convinced that an association between you and Company will be mutually rewarding, and we look forward to working with you. If I can be of further assistance, please do not hesitate to contact me at 215-657-7010.

Sincerely,

I have read the above letter and
accept Company's offer on the
terms stated therein.

Bob Ellis
EVP, Operations & Legal

6/2/02
Date

EXHIBIT A
5

Quality Systems, Inc.
## NextGen Healthcare Information Systems Division
(NextGen Healthcare Information Systems Division hereinafter referred to as "Company")

# FY 2003 Commission Plan (Effective 04/1/2002)

For Employee:                    Traci Wolpert                          Date:

Quota Period:             April 1, 2002 through March 31, 2003

Total Bookable Revenue Quota:    $       1,300,000

Commission Rates:    6% of Bookable Margin (as defined herein), on sales made by Employee

2.5% of Bookable Margin for sales made by Re-sellers in Employees assigned Territory, unless Employee is instrumental in helping Reseller to close a sale, in which case the Commission Rate for such sale shall be 6% instead of 2.5%

Rates above are subject to reduction based on discounting as defined herein.

"Bookable Revenue" shall be defined as the amount of sales revenue that the Company recognizes, booked in accordance with standard accounting principles, plus the amount of deferred revenue for Company-provided services sold, and not including sales taxes, shipping charges and the like, for including software and hardware maintenance services for 12 months from the date of the sale.

"Bookable Margin" shall be defined as Bookable Revenue less Company's direct costs including hardware cost to Company, as well as third party software and third party services costs, etc.

Term 1: Employee will be instructed to prepare and submit periodic sales reports, forecasts, turn in to maintain up-to-date information regarding all sales activities in Company's "Goldmine" information system, and to follow certain administrative procedures. Provided that Employee has timely basis for the three month period prior to any given sale (or for Employees with Company in 3 months, during the entire duration of employment), then Company shall increase the commission rate on such sale by 1%.

Term 2: Provided Employee has made enough sales to achieve his or her assigned Total Bookable Revenue Quota during the Quota Period, then Employee shall receive an additional bonus of 1% Bookable Revenue on Employee's sales during the Quota Period

Term 3: Provided Employee has earned Bonus 2, and provided Employee sells a minimum of 5 new customers (customers that have not previously purchased from Company which have purchased a minimum of $25,000 worth of software and services) then Employee shall earn an additional .5% bonus of all Bookable Revenue on Employee's sales during the Quota Period.

Term 4: Provided Employee's Bookable Revenue is in excess of 150% of Total Bookable Revenue Quota, and provided QSI's (entire company) after tax profit for the Fiscal Year in which the sales

EXHIBIT A
6

excess of 10% of the Company's total sales revenues after the inclusion of standard commissions and such bonus, then Employee shall receive an additional bonus of 1% of all Revenue on Employee's sales during the Quota Period.

S SHALL APPLY ONLY IN THE EVENT THAT EMPLOYEE'S PERCENTAGE OF REVENUE BOOKED DURING THE QUOTA PERIOD DOES NOT EXCEED 30% OF EE'S TOTAL BOOKABLE REVENUE. Company may, at its option, waive this requirement e-approved circumstances.

*R FOR A SALE TO COUNT IN A PARTICULAR PERIOD FOR QUOTA AND/OR BONUS ES, COMPANY MUST HAVE RECOGNIZED THE REVENUE FOR SUCH SALE IN THE ERIOD.*

of Commissions. After the Company has been paid more than thirty percent (30%) of the total unt by the customer on a particular sale, and provided the Employee is still employed by , then Employee shall be paid a pro-rated portion of the commission based upon the ge of the total sale amount paid by the customer to Company. Thereafter, as additional s are made by the customer against the total sale amount, and provided the Employee is still by Company, additional pro-rated commission payments shall be made to Employee. When y has been paid more than eighty percent (80%) of the total sale amount on the sale, and Employee is still employed by Company, the commission shall be considered "earned". Once ssion is earned, the Employee will be paid the full commission due (or credited, as set forth to commissions shall be paid to any Employee not employed by Company at the time the ned.

of Bonuses 2 through 4. Bonuses 2-4 and the Profit Bonus set forth on Page 3 herein shall be in 120 days of the end of the Company's fiscal year, provided that Company has been in eighty percent (80%) of the total of all sales used to calculate such bonuses and provided oloyee is still employed by Company at that time. In the event that Company has not been in eighty percent (80%) of such total sales, then bonuses 2 through 4 would be paid upon y's receipt of payment of more than 80% of the Employee's total sales for the appropriate provided Employee is still employed by Company at that time. Company reserves the right in its retion to pay any bonus or commission prior to collecting 80% of the total of all sales used the bonus.

s for Employees with "Draws". A "Draw" is a loan against future anticipated commissions. ay be provided periodically in accordance with Company's payroll practices. All commissions Employee are applied against any Draw balance, then after any Draw balance is exhausted, fifty (50%) of any credit balance shall be paid to Employee in each payroll period until such credit has been exhausted

unt of all Draws, less the amount of earned commissions credited against such draw shall be payable by Employee to Company upon any termination of Employee's employment with ny. Employee agrees and authorizes Company to first apply against their outstanding draw any salary, earned commission, expense reimbursement monies and/or vacation pay vely referred to as "Final Pay") that may be owed to Employee upon any termination of e's employment.

ny reserves the right to cease providing draw to Employee without notice.

t Authority. On new sales, the sales price may be discounted by Employee, by an amount not ng fifteen percent (15%) of Company-developed software and Company-provided services without the approval of Employee's supervisor. Such discount percentage may be increased to percent (20%) upon prior approval of the Vice President of Sales. Any further discounting more

EXHIBIT A

approved in writing by Patrick Cline or Lou Silverman.  Should a sale be discounted without approvals, Company reserves the right to reduce commission dollar-for-dollar, if possible, up to the amount of the discount.

**Rate Reduction**: Should any sale be discounted by 10% or more, then the Commission shall be reduced.  The reduction will be pro rata on a scale of one percentage point of commission per ten percent of discount. For example, should the price of a system be discounted on a particular sale by twenty percent, the Commission Rate for that sale would be reduced by 2 percentage points, making the base commission rate 4% instead of 6%.  A fifteen percent discount would make the commission rate 4.5%, etc.

**Consultants / Payment of Finder's Fees**:  From time to time, an outside (non-employee) Consultant (or other person or entity) contributing to the sales process may require the payment of a Finder's Fee or commission on a sale.  Such fees or commissions are treated as additional discounts for the purpose of commission calculations.  Company also reserves the right to treat other extraordinary sales-related expenses as if they were discounts for the purpose of commission calculations.

Company employees may be asked by Employee to perform sales demonstrations for Employee in connection with a sales opportunity.  When such Sales Consultants are used by Employee (and Company has required the use of the Sales Consultant) Company reserves the right to deduct the Sales Consultant's commission, up to three quarters of one percent (.75%) directly from Employee's commission when the resulting sale amount is under $100,000.

**Commission Cap / Profit Bonus**:  Should the commission (commission on a sale to a single customer or related set of customers) exceed $100,000.00. Upon calculating a commission using Company's standard methods as discussed previously herein, should such commission exceed $100,000.00, then commission shall be reduced to $100,000.00. The amount of such reduction shall be held by Company and deemed earned by Employee as a bonus in the event that Company's net after tax profit for the Fiscal Year in which sales are made is in excess of 10% of the Company's total sales revenues after the inclusion of related corporate allocations and such bonus. The Company's net after tax profit shall be determined by the Company's Chief Financial Officer in accordance with standard accounting procedures.

**"House" Sales**: Under certain special circumstances, a sale may be pursued and made by someone other than Employee or a re-seller of Company. Such sales may be deemed "house" sales by the President or Vice President of Sales of Company, and Employee shall not be entitled to commission or quota recognition on such sales.

**Commission or Bonus Reversal**: Should a customer return for a refund any items on which a commission has been paid within nine (9) months of the date of the sale, the commission amount paid on such sale and the commission paid to the Employee must be repaid by such Employee to Company. Further, should a customer return for a refund any items used in calculating any bonus hereunder, then such bonus calculation shall be performed again without including the returned items. Should Company be required to write off (or reserve for) monies related to any sale due to non-payment by a customer, then commission and bonus amounts shall be adjusted down accordingly based on re-calculations of any such commission or bonus which would not have been earned, such commission or bonus shall not be paid to Employee, and if already paid to Employee, such commission or bonuses must be repaid by Employee to Company. An exception to this paragraph (this paragraph only) will be made in the case that Employee has been involuntarily terminated by Company, and such termination was not the result of a material breach of one or more of the terms of Employee's employment with Company.

EXHIBIT A

tation. In the event of a dispute involving the arbitration, the Commission or the Company shall prevail and shall be binding. This Plan does not constitute a This plan is subject to change without notice.

acted, read and agree" upon by

Page 4

EXHIBIT A
9

# EXHIBIT B



## QUALITY SYSTEMS, INC.
## EMPLOYEE CONFIDENTIAL INFORMATION AGREEMENT

THIS CONFIDENTIAL INFORMATION AGREEMENT ("Agreement") is between QUALITY SYSTEMS, INC., its and/or affiliated present and future subsidiaries (including, but not limited to, Medical Institute information agreements, Inc., and hereinafter collectively referred to as "QSI") and the undersigned ("Employee") is for the new or existing employee of Employee. In consideration of the existing and the continued employment of Employee, and specifically in consideration of Employee's access to confidential information of QSI, and Employee hereby covenant and agree as follows:

**Confidential Information.** Employee acknowledges that all Confidential Information of QSI, its subsidiaries...

**Customers.** During the term of employment and for one (1) or more years after Employee leaves the employ of QSI...

**Soliciting Employment.** Employee agrees that during his/her employment with QSI, Employee will not engage in any other employment, occupation, consulting or other activity relating to the business in which QSI is now or may hereafter become engaged...

**Employee.** Employee also brings QSI's employees...

**Return of Documents/Materials.** In the event of termination of employment with QSI for any reason whatsoever, Employee agrees to promptly return or deliver to QSI all records, materials, equipment, drawings, documents and data of any nature pertaining to his/her employment with QSI...

EXHIBIT B

# Exhibit 2

# QUALITY SYSTEMS, INC.
## EMPLOYEE CONFIDENTIAL INFORMATION AGREEMENT

THIS CONFIDENTIAL INFORMATION AGREEMENT (the "Agreement") is entered into by and between QUALITY SYSTEMS, INC., for and on behalf of itself and its present and future affiliates and/or subsidiaries, including but not limited to MicroMed Healthcare Information Systems, Inc. and Clinitec International, Inc. (collectively referred to as "QSI"), and the undersigned ("Employee"), to be effective as of the first date of employment of Employee. In consideration of the foregoing and the mutual covenants and agreements contained in this Agreement, and specifically in consideration of Employee's continued employment or initial employment by QSI, whichever is applicable, QSI and Employee covenant and agree as follows:

**Confidential Information.** Employee may acquire Confidential Information of QSI, its customers or prospective customers, and their patients. Employee agrees to keep confidential, and not to disclose or make any use of except for the benefit of QSI, at any time, either during or subsequent to his/her employment, any trade secrets, confidential information, knowledge, data or other information of QSI relating to its products, software, formulations, computer programs and associated documentation, cost and price calculations, suppliers, customers, potential customers, processes, know-how, designs, formulas, test data, employee information, customer lists, business plans, marketing plans and strategies, pricing strategies or other subject matter pertaining to any business of QSI or any of its customers, prospective customers, consultants, licensees or affiliates, which Employee may produce, obtain or otherwise acquire during the course of his/her employment. Employee further agrees not to deliver, reproduce or in any way allow any such trade secrets, confidential information, knowledge, data or other information, or any documentation relating thereto, to be delivered or used by any third parties without specific direction or consent of a duly authorized representative of QSI.

**Conflicting Employment.** Employee agrees that during his/her employment with QSI, Employee will not engage in any other employment, occupation, consulting or other activity relating to the business in which QSI is now or may hereafter become engaged (while Employee is employed at QSI) or which would otherwise conflict with Employee's obligations to QSI.

**Return of Documents/Materials.** In the event of termination of employment with QSI for any reason whatsoever, Employee agrees to promptly surrender and deliver to QSI all records, materials, equipment, drawings, documents and data of any nature pertaining to his/her employment with QSI.

California

**Customers.** During the period of his/her employment, and for one (1) year after that employment terminates for any reason, the Employee shall not, directly or indirectly, make known to any person, firm, or corporation the names or addresses of any of the customers or potential customers of QSI or any other information pertaining to them, or call on, solicit, take away, or attempt to call on, solicit, or take away any of the customers or potential customers of QSI, either for himself/herself or for any other person, firm, or corporation. For purposes of this agreement, "potential customers" are companies and/or their representatives that have been contacted by QSI for the purpose of making a sale of any of its products or services within the one (1) year period preceding the cessation of the Employee's employment at QSI. Employee acknowledges and agrees that any such solicitation, inducement, or interference would be wrongful and would constitute a misuse or misappropriation of QSI's Confidential Information described herein and would cause irreparable and incalculable harm to QSI. Employee acknowledges and agrees that such restrictions are fair and reasonable.

**Employees.** Employee acknowledges and agrees that QSI's employees and its information about employees constitute a valuable asset and Confidential Information of QSI. Employee agrees that he/she will not, during his/her employment by QSI and for a period of one (1) year after that employment terminates for any reason, directly or indirectly, for himself/herself or on behalf of any other person or entity, raid or solicit any of QSI's employees for a competing business or otherwise induce or attempt to induce any such employees to terminate their employment with QSI or to otherwise disrupt or interfere or attempt to disrupt or interfere with QSI's relationships with such employees. Employee acknowledges and agrees that any such solicitation, inducement, or interference would be wrongful and would constitute unfair competition and would cause irreparable and incalculable harm to QSI. Employee

1

acknowledges and agrees that such restrictions are fair and reasonable.

**Employee Works.** Employee hereby assigns to QSI all right, title and interest in any and all inventions, ideas and works of authorship created by Employee using QSI's resources, during Employee's work hours or related to any product, service, idea, invention or technology created or used by QSI ("Employee Works"), including all worldwide copyrights, trade secrets, and all patent, proprietary and property rights therein. Employee agrees to execute, without further consideration, such assignments, instruments and documents as QSI deems necessary or desirable in order to effect the assignment of the Employee Works.

**At will employment.** Employee represents and warrants that Employee's execution of and performance of this Agreement will not violate or impair any other obligations of Employee, whether under an employment or consulting agreement or otherwise. It is expressly understood and agreed that Employee's employment by QSI is at will and that either party to the employment relationship, may terminate it and this Agreement at any time, with or without reason, with or without cause. Employee further understands and agrees that this at will employment relationship can only be changed by a writing signed by the Employee and the President of QSI.

**Miscellaneous.** In the event that any paragraph or provision of this Agreement shall be held to be illegal or unenforceable in any jurisdiction, such paragraph or provision shall, as to that jurisdiction, be adjusted and reformed, if possible, in order to achieve the intent of the parties, and if such paragraph or provision cannot be adjusted and reformed, such paragraph or provision shall, for the purposes of that jurisdiction be voided and severed from this Agreement, and the entire Agreement shall not fail on account thereof but shall otherwise remain in full force and effect. QSI and the Employee agree that the validity, interpretation, construction, and performance of this Agreement shall be governed by the laws of the State of California, without giving effect to conflict of laws or choice of law principles.

In Witness Whereof, the parties have executed this Agreement the 3 day of June , 2002 The undersigned employee also acknowledges that consideration in such form as a job offer, salary review, or implementation of a bonus or commission plan has been given and accepted.

_____
Employee

_____
Quality Systems, Inc.

_____
Title

California                                        2

# Exhibit 3

Andrew D. La Fiura (Pennsylvania SBN. 307891)
JACKSON LEWIS P.C.
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, Pennsylvania 19102-1317
Tel:   (267) 319-7802
Fax:  (215) 399-2249
E-mail:        andrew.lafiura@jacksonlewis.com

Jared L. Bryan (SBN. 220925)
Vandana Kapur (SBN. 281773)
JACKSON LEWIS P.C.
5000 Birch Street, Suite 5000
Newport Beach, California 92660
Tel:  (949) 885-1360
Fax:  (949) 885-1380
Email:        Jared.Bryan@jacksonlewis.com
              vandana.kapur@jacksonlewis.com

Attorneys for Defendants
QUALITY SYSTEMS, INC. and NEXTGEN HEALTHCARE INFORMATION
SYSTEMS, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| TRACI WOLBERT,<br><br>            Plaintiff,<br><br>       vs.<br><br>QUALITY SYSTEMS, INC. NEXTGEN HEALTHCARE INFORMATION SYSTEMS, and DOES 1 through 10, INCLUSIVE,<br><br>            Defendants. | CASE NO. CV-8:15-cv-00550-JLS-RNB<br><br>[Assigned to the Hon. Josephine L. Staton, Courtroom 10A ; Magistrate Judge Robert N. Block, Courtroom 6D]<br><br>**DECLARATION OF STEVE PUCKETT**<br><br>*[Filed concurrently with Notice of Motion and Motion, Memorandum of Points and Authorities in Support, Declarations in Support, and [Proposed] Order]*<br><br>Date:         October 23, 2015<br>Time:         2:30 p.m.<br>Courtroom:    10A<br><br>Complaint Filed:  April 8, 2015<br>FAC Filed:  May 4, 2015 |

I, Steve Puckett, being duly sworn, states as follows:

Case 8:15-cv-00550-JLS-RNB   Document 24-3   Filed 09/18/15   Page 2 of 5   Page ID #:165

1      1.      I am currently employed as Executive Vice President and Chief Technical

2   Officer ("CTO") of Quality Systems Inc. ("QSI").  I started my employment with QSI in

3   2009 and have been in my current position since 2012.

4      2.      I have been a resident of the state of Florida since 2007.

5      3.      I do not own property nor have I ever resided anywhere in California.

6      4.      I am familiar with a former employee named Traci Wolbert.

7      5.      From July 2013 through October 2014, Ms. Wolbert reported to me in her

8   capacity as Director of Clinical Programs.

9      6.      Ms. Wolbert and I did not work in the same location.

10      7.      More particularly, I work between QSI's offices in Irvine, California,

11   Horsham, Pennsylvania, my home in Orlando, Florida and Defendants' other locations

12   around the country.  In contrast, Plaintiff worked mainly from her home in Philadelphia,

13   Pennsylvania.  On occasion, Ms. Wolbert would also work from QSI's Horsham,

14   Pennsylvania location, which is where she maintained her office.

15      8.      As a result, virtually all of my communications with Ms. Wolbert were done

16   over email, text message and telephone.

17      9.      In fact, to the best of my recollection, Ms. Wolbert and I were in the same

18   physical location less than 20 times during her employment with Defendants.

19      10.      The vast majority of these occurrences were in Pennsylvania, in particular in

20   Philadelphia or at Defendant NextGen's Horsham location.  Plaintiff and I never worked

21   or were otherwise together in California.

22      11.      On October 1, 2014, while at a conference in Chicago, Illinois, I was

23   approached by Dr. Robert Murry, a physician who works part-time for QSI, and Alicia

24   Carden, a member of Ms. Wolbert's team.  Both individuals expressed concern to me

25   about Ms. Wolbert's performance and requested that she be removed from the KBM

26   project.

27      12.      On October 10, 2014, Donna Greene and I had a telephone conversation

28   with Plaintiff to advise her that she was being transferred from the

---

1    KBM project to the NG7 project.  During this call, Ms. Greene and I were in

2    Irvine, California.  Upon information and belief, Plaintiff was in Pennsylvania.

3            Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

4    foregoing is true and correct.

5

6                                              _____

7                                              Steve Puckett

8    Dated:   *August 28, 2015*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CASE NAME:     TRACI WOLBERT vs. QUALITY SYSTEMS, INC., ET AL.

CASE NUMBER:   CV-8:15-cv-00550-JLS-RNB

     I am employed in the County of ORANGE, State of California.  I am over the age of 18 and not a party to the within action; my business address is 5000 Birch Street, Suite 5000, Newport Beach, CA  92660.

     On September 18, 2015, I served following document(s) described as:

### DECLARATION OF STEVE PUCKETT

on the parties in this action listed below in the manner designated below:

### PLEASE SEE ATTACHED SERVICE LIST

☒     **BY NOTICE OF ELECTRONIC FILING**.   The above-listed counsel have consented to electronic service and have been automatically served by the Notice of Electronic Filing, which is automatically generated by CM/ECF at the time said document was filed, and which constitutes service pursuant to FRCP 5(b)(2)(D).

☒     **FEDERAL**  I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

     Executed on September 18, 2015, at Newport Beach, California.

                            */s/ Lisa Uyesugi*
                            Lisa Uyesugi

1 | **SERVICE LIST**

| Sharon Rachel Vinick, Esq.<br>LEVY VINICK BURRELL HYAMS LLP<br>180 Grand Avenue, Suite 1300<br>Oakland, CA  94612 | **Co-Counsel for Plaintiff,**<br>**TRACI WOLBERT**<br><br>Tel:   (510) 318-7700<br>Fax:   (510) 318-7701<br>Email:      sharon@levyvinick.com |
|---|---|
| Patricia V. Pierce, Esq.<br>GREENBLATT PIERCE ENGLE FUNT<br>AND FLORES<br>123 South Broad Street, Suite 2500<br>Philadelphia, PA  19109 | **Co-Counsel for Plaintiff,**<br>**TRACI WOLBERT**<br><br>Tel:   (215) 735-1600<br>Fax:   (215) 735-1660<br>Email:      p.pierce@gpeff.com |

4811-3622-0968, v. 1

# Exhibit 4

February 17, 2015
Page 12 of 51

### III. SCOPE AND METHODS USED

**A.   Focus**

At the time of its engagement, Wagener Law was given the assignment and general scope of the investigation:  To investigate Ms. Wolbert's sexual harassment and retaliation concerns contained in her Memo to the Board.  Ms. Wolbert provided Mr. Wagener at the outset of her first interview a written statement outlining her concerns ("Ms. Wolbert's Written Statement").[38]  In that document, Ms. Wolbert also raises other concerns, some from several years ago, relating to Kelly Skeen, Mr. Eggena, Andrew Seymour, and Steve Williamson.  Those issues were excluded from the Investigation scope.

Our assignment was to identify issues and to make findings of fact.  We were not requested to make any conclusions as to whether anyone at the Company violated Company policy or the law.  This Investigation report includes a summary of factual findings and conclusions only and should not be interpreted as providing any opinion as to whether any Company policy or the law was violated.

**B.   Determination of Issues and Evidentiary Standard**

Wagener Law independently determined the potential issues.  This was accomplished through conducting witness interviews and reviewing various documents the Investigator obtained during the Investigation, including the Memo to the Board and Ms. Wolbert's Written Statement.

Where the evidence was circumstantial, the Investigators applied a preponderance of the evidence standard to reach the conclusions in this report (i.e., whether the evidence "more likely than not" supports the finding).  This is the industry standard for workplace investigations; it is also same standard that is applied in most civil cases.

**C.   Identification of Witnesses, Content of Interviews and Collection of Documents**

Wagener Law operated with independence during the Investigation.  We determined witness identification, interview content, identification of documents to collect and review, and preparation of factual findings and conclusions.  We interviewed the following witnesses on the dates listed.  All dates are 2014, and unless otherwise stated were conducted in person:[39]

1.  Alicia Carden        December 14 (T.D.)

2.  Ben Mehling ·        November 20 (via Skype) (M.W.)

---

[38] A copy of Ms. Wolbert's Written Statement is attached as Exhibit 22.

[39] Interviews conducted by Mr. Wagener are indicated with "M.W." and those conducted by Ms. Dennis are indicated with "T.D."

February 17, 2015
Page 13 of 51

3.  Bob Barker          November 13 (T.D.)
4.  Bryan Gaj           December 3 (T.D.)
5.  Celeste McIver      December 15 (by phone) (T.D.)
6.  Dawn Sowash         November 14 (T.D.)
7.  Donna Green         November 13 and 20; December 15; December 22 (phone) (M.W.)
8.  Dottie Pinnick      December 2 (Skype) (T.D.)
9.  Judy Taylor         December 15 (M.W.)
10. Julie Baker         November 20 (M.W.)
11. Laura Anderson      November 13 and 14; December 17 (phone) (T.D.)
12. Marla Luoni         December 22 (by phone) (M.W.)
13. Mike Lovett         November 13 (T.D.)
14. Robert Murry        November 13 (T.D.)
15. Russ Hill           November 13 (T.D.)
16. Steve Puckett       December 2 and 18; December 8 (phone) and 23 (Skype)
17. Tim Eggena          December 3 (WebEx) (T.D.)
18. Traci Wolbert       November 6; December 22 (Skype) (M.W.)



# Exhibit 5

1  Andrew D. La Fiura (Pennsylvania SBN. 307891)
   JACKSON LEWIS P.C.
2  Three Parkway
   1601 Cherry Street, Suite 1350
3  Philadelphia, Pennsylvania 19102-1317
   Tel:   (267) 319-7802
4  Fax:  (215) 399-2249
   E-mail:       andrew.lafiura@jacksonlewis.com
5
   Jared L. Bryan (SBN. 220925)
6  Vandana Kapur (SBN. 281773)
   JACKSON LEWIS P.C.
7  5000 Birch Street, Suite 5000
   Newport Beach, California 92660
8  Tel:   (949) 885-1360
   Fax:  (949) 885-1380
9  Email:       Jared.Bryan@jacksonlewis.com
                vandana.kapur@jacksonlewis.com
10
   Attorneys for Defendants
11 QUALITY SYSTEMS, INC. and NEXTGEN HEALTHCARE INFORMATION
   SYSTEMS, LLC
12

13              **UNITED STATES DISTRICT COURT**

14     **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

15

16 TRACI WOLBERT,                    ) CASE NO. CV-8:15-cv-00550-JLS-RNB
                                      )
17          Plaintiff,               ) [Assigned to the Hon. Josephine L. Staton,
                                      ) Courtroom 10A ; Magistrate Judge Robert
18     vs.                           ) N. Block, Courtroom 6D]
                                      )
19 QUALITY SYSTEMS, INC. NEXTGEN     ) **DECLARATION OF JANE KURCON**
   HEALTHCARE INFORMATION           )
20 SYSTEMS, and DOES 1 through 10,   ) *[Filed concurrently with Notice of Motion*
   INCLUSIVE,                        ) *and Motion, Memorandum of Points and*
21                                    ) *Authorities in Support, Declarations in*
                                      ) *Support, and [Proposed] Order]*
22          Defendants.              )
                                      ) Date:          October 23, 2015
23                                    ) Time:          2:30 p.m.
                                      ) Courtroom:     10A
24                                    )
                                      ) Complaint Filed:  April 8, 2015
25                                    ) FAC Filed:  May 4, 2015
                                     
26         I, Jane Kurcon, being duly sworn, states as follows:

27         1.     I am currently employed by Defendant NextGen Healthcare Information

28 Systems, LLC ("NextGen") as a human resources representative.

1      2.     In that role, I have access to Defendant NextGen's personnel records and

2  review them in the regular course of business.

3      3.     In connection with Defendants' Motion to Change Venue, I was asked to

4  obtain the states of residence of several current and former employees of Defendant QSI

5  and Defendant NextGen.

6      4.     I obtained the states of residence by reviewing the personnel records for the

7  requested employees.  Those records reflect the following:

8           a.  Laura Anderson is a current employee and Pennsylvania resident.

9           b.  Russ Hill is a current employee and Pennsylvania resident.

10           c.  Dawn Sowash is a current employee and Pennsylvania resident.

11           d.  Diane Spengel is a former employee and Pennsylvania resident.

12           e.  Alicia Carden is a current employee and North Carolina resident.

13           f.  Dr. Robert Murry is current employee and New Jersey resident.

14           g.  Ben Mehling, is a former employee and California resident.

15           h.  Donna Greene is a current employee and California resident.

16      5.     Approximately 550 people work out of Defendant NextGen's Horsham, PA

17  facility, all of whom are employees of either Defendant NextGen or its parent, Defendant

18  Quality Systems, Inc.

19      6.     I am familiar with a former employee of Defendant NextGen named Traci

20  Wolbert.

21      7.     As a former employee of Defendant NextGen, Ms. Wolbert's personnel

22  records are located in Defendant NextGen's Horsham office.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

2  foregoing is true and correct.

3

4                    Jane Kurcon

5

6  Dated: _8/31/2015_

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2  **UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

3  CASE NAME:     TRACI WOLBERT vs. QUALITY SYSTEMS, INC., ET AL.

4  CASE NUMBER:   CV-8:15-cv-00550-JLS-RNB

5          I am employed in the County of ORANGE, State of California.  I am over the age
6  of 18 and not a party to the within action; my business address is 5000 Birch Street, Suite
   5000, Newport Beach, CA  92660.
7

8          On September 18, 2015, I served following document(s) described as:

9

## DECLARATION OF JANE KURCON

10  on the parties in this action listed below in the manner designated below:

11

## PLEASE SEE ATTACHED SERVICE LIST

12

13  ☒    **BY NOTICE OF ELECTRONIC FILING.**   The above-listed counsel have
14  consented to electronic service and have been automatically served by the Notice of
    Electronic Filing, which is automatically generated by CM/ECF at the time said
15  document was filed, and which constitutes service pursuant to FRCP 5(b)(2)(D).

16  ☒    **FEDERAL**   I declare under penalty of perjury under the laws of the State of
17  California and the United States that the foregoing is true and correct, and that I am
    employed in the office of a member of the bar of this Court at whose direction the service
18  was made.

19
20          Executed on September 18, 2015, at Newport Beach, California.

21

22                         _/s/ Lisa Uyesugi_
                          Lisa Uyesugi

23

24

25

26

27

28

---

CV-8:15-cv-00550-JLS-RNB                     4                    DECLARATION OF JANE KURCON

| | |
|---|---|
| 1 | **SERVICE LIST** |

| | |
|---|---|
| Sharon Rachel Vinick, Esq.<br>LEVY VINICK BURRELL HYAMS LLP<br>180 Grand Avenue, Suite 1300<br>Oakland, CA 94612 | **Co-Counsel for Plaintiff,<br>TRACI WOLBERT**<br><br>Tel: (510) 318-7700<br>Fax: (510) 318-7701<br>Email: sharon@levyvinick.com |
| Patricia V. Pierce, Esq.<br>GREENBLATT PIERCE ENGLE FUNT<br>AND FLORES<br>123 South Broad Street, Suite 2500<br>Philadelphia, PA 19109 | **Co-Counsel for Plaintiff,<br>TRACI WOLBERT**<br><br>Tel: (215) 735-1600<br>Fax: (215) 735-1660<br>Email: p.pierce@gpeff.com |

4850-7880-1192, v. 1

# Exhibit 6

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

TRACI WOLBERT,

        Plaintiff,

    vs.

QUALITY SYSTEMS, INC.
NEXTGEN HEALTHCARE
INFORMATION SYSTEMS, and
DOES 1 through 10, INCLUSIVE,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV-8:15-cv-00550-JLS-RNB

[Assigned to the Hon. Josephine L. Staton, Courtroom 10A ; Magistrate Judge Robert N. Block, Courtroom 6D]

### AFFIDAVIT OF BEN MEHLING

I, M. Benjamin Mehling, being duly sworn do depose and say as follows:

1.    I was previously employed as Vice President of Research & Development for Quality Systems, Inc. ("QSI").

2.    In that role, I oversaw the development of the Company's NG7 project and reported directly to Steve Puckett, Chief Technology Officer.

3.    I first met Traci Wolbert in January 2014. At the time, her title was Director of Clinical Program Management and she reported to Steve Puckett.

4.    In January 2014, Ms. Wolbert was asked to split her time between overseeing the product enhancements and maintenance of the Knowledge Base Module ("KBM") module within the existing NextGen Ambulatory application and assisting me in the development of the NG7 project.

5.    With respect to NG7 specifically, Ms. Wolbert was responsible for providing clinical product leadership. In short, this meant that Ms. Wolbert was in charge of defining the product's ultimate functionality, user interface, and appearance from a clinical standpoint.

6.    During the January-October 2014 time frame, I developed some concerns about Ms. Wolbert's leadership and management style. These concerns were based on my personal observation as well as my conversations with subordinates and colleagues.

7.  In late 2013 and early 2014, NextGen was in the midst of selecting a clinical content provider for all divisions and Ms. Wolbert was the primary owner of this initiative. Given her responsibilities over the clinical applications, I focused on the technical architecture and necessary due diligence. For a period of several months she was unwilling to work with the architectural resources on my team or directly connect those resources with the content provider to complete the necessary knowledge transfer. Ultimately the technical team integrated the content without the necessary knowledge, which created two large, but avoidable, technical issues during Alpha testing.

8.  I also developed concerns about NG7's user interface design, which was within Ms. Wolbert's area of responsibility. She was creating a novel user interface that was a major departure from how physicians interact with systems similar to the one we were building. Creating new and novel designs can be innovative, but standard best practice dictates that the design team run a series of usability tests with likely end-users to validate the new design. I had multiple discussions with Ms. Wolbert about the risk associated with her design and she assured me that the team would be validating the design prior to costly software development beginning.

9.  In October 2014, Ms. Wolbert was officially moved under my direct supervision and instructed to spend all of her time working on the NG7 project.

10.  I learned of the restructuring directly from Ms. Wolbert, who informed me that she was moving onto my team because her KBM team had expressed concerns about her leadership.  Ms. Wolbert informed me that a collective decision had been made among herself, Mr. Puckett, and Donna Green that her talents would be better served by working solely on NG7.

11.  I have no first-hand knowledge as to whether this restructuring had any impact on Wolbert's overall compensation.

12.  Prior to the restructuring, I had no knowledge of Ms. Wolbert making any complaints about Mr. Puckett or any other employees of QSI or NextGen.

13.  Upon officially joining my team, Ms. Wolbert was informed on multiple occasions by Mr. Puckett and myself that she could build her own team to assist her on the NG7 project. For reasons that are unclear to me, Ms. Wolbert never took steps to build and propose a staffing plan for her own team.   As a result, I negotiated a temporary solution — approximately 6 employees were lent to her from another department.

14.  At the time, the Vice President over these employees, Christie Guthrie, expressed concern to me about Ms. Wolbert.  Specifically, Ms. Guthrie told me she thought Ms. Wolbert's management style would drive these employees to resign. As a result, we jointly agreed to leave the employees reporting to their current manager, Leslie Cobb, and to use Ms. Cobb as a liaison between Ms. Wolbert and these employees for reporting purposes.

15.   As a full-time member of my team, Ms. Wolbert's main tasks in connection with NG7 remained essentially same.   That is, she was expected to (a) select a viable clinical content provider; (b) design an effective user experience; and (c) create the application requirements which ultimately define the functionality of the software.   She failed in all three.

16.   With respect to task (a), I expected Ms. Wolbert had performed a thorough analysis of the available clinical content providers and obtained feedback from qualified clinicians (NextGen employees and likely future users/customers) as to which provider to ultimately choose.

17.   Ms. Wolbert initially chose a content provider with minimal consultation from NextGen clinicians.  I subsequently learned during a two day internal summit on clinical content in November 2014 that our clinicians did not agree that the content provider selected by Ms. Wolbert was viable or safe for use in the market.   During the meeting, it became clear that Ms. Wolbert did not sufficiently vet her choice with any of the clinicians on staff.  It also became clear that, had Ms. Wolbert fulfilled her responsibility to perform due diligence during the content provider selection initiative, it would have been obvious to Ms. Wolbert that her chosen clinical provider was not trusted by our own clinicians.

18.   At this point, substantial time and resources (approximately one third or more of the entire team had worked to integrate the clinical content over a nine to twelve month period) had already been devoted to developing the program with Ms. Wolbert's chosen content provider.   Based on my meeting with the clinicians, however, we were forced to redo all aspects of this integration (complete removal and replacement) to ensure that the proper clinical provider was integrated prior to the project's roll out.

19.   With respect to task (b), Ms. Wolbert was expected to develop the actual NG7 interface that users would need to navigate in order to properly use the program.

20.   While Ms. Wolbert had some novel ideas regarding the interface, I consistently stressed to her the need to have the concepts validated using industry and usability science best practices (which includes testing with potential users).

21.   I subsequently learned that Ms. Wolbert did not validate the user experience.

22.   As a result, during NG7's alpha-testing phase in mid-September 2014, we learned for the first time that NG7 had huge design problems.   This was far too late in the development process, and similar to the content engine, required significant rework to the software, thus negatively impacting budget and timeline.

23.   With respect to task (c), Ms. Wolbert was expected to create the application requirements for the NG7 project.  This is the core responsibility of product management and required

Ms. Wolbert and her team to essentially write the technical requirements for the system, which would then need to be implemented by our software developers.

24.    Ms. Wolbert's work here was again subpar.   Essentially, Ms. Wolbert and her team recycled technical requirements from the older version of the system and passed it along to the developers.  The developers, in turn, could not make sense of the requirements because they did not match up with the context, workflow, and architecture of NG7.

25.    Throughout the development of NG7, I received consistent negative feedback from the software developers about the requirements they were receiving from Ms. Wolbert.  I had multiple discussions with Ms. Wolbert and her team about this negative feedback.

26.    Each time, Ms. Wolbert acknowledged the problems stating that the copied requirements were "placeholders" that her team would be returning to and fixing. She assured me that the issue would be resolved rapidly.   The issues were not resolved, and we essentially needed to start the requirements process from scratch, creating more costly delays and schedule slips.

27.    In the first week of January 2015, a three day review of the NG7 project was conducted in Austin, Texas.   The review was overseen by Mr. Puckett, Michael Lovett (Executive Vice President and General Manager of NextGen Ambulatory's division) and Gary Voydanoff (Executive Vice President of Sales and Marketing).  NG7 received a lukewarm reception. Mr. Lovett pointed out that the delays due to the content partner issue was a "huge miss" — a completely accurate assessment. The silence in the room following the commentary from a senior leader was palpable.

28.    On January 8, 2015, I met with my team and Mr. Puckett to discuss some of the issues that arose during the review.   In particular, the review highlighted the lack of clinical product leadership and the lack of clinical user interface validation in the project.  Both of these areas fell squarely within Ms. Wolbert's area of responsibility.

29.    During this subsequent meeting, several of my leadership team volunteered that NG7's biggest barriers to success were related to the clinical components — the components that fell under the responsibility of Ms. Wolbert.  When we listed and prioritized actions we needed to take to bring the program back onto a successful path, the attendees unanimously agreed the number one issue facing the program was Clinical Product and Design Leadership. The implication was clear — a clinical and design leadership change was what the team (including I) believed was the highest priority and our only chance of success.

30.    To my knowledge, no one in the January 8, 2015 meeting, with the exception of myself and Mr. Puckett, had any knowledge that Ms. Wolbert had issued any complaints about Mr. Puckett, Donna Green, or anyone else at QSI or NextGen.

31.   Based on this meeting, and in light of the ongoing problems I had witnessed with Ms. Wolbert's work performance, I requested permission to terminate Ms. Wolbert's employment.

32.   I was given permission and, on January 30, 2015, I terminated Ms. Wolbert's employment. Julie Baker from the human resources department was in attendance.

33.   My decision to request permission to terminate Ms. Wolbert's employment had nothing to do with any complaints Ms. Wolbert may have made about Mr. Puckett, Ms. Green, or anyone else at QSI or NextGen.

34.   My decision was based purely on legitimate performance and business reasons and in an effort to save the NG7 project.

I declare, under penalty of perjury, that the foregoing is true and correct.

M. Benjamin Mehling

DATED: 7/27/2015

4821-3914-4741, v. 2

# Exhibit 7

## U.S. District Court — Judicial Caseload Profile

**PENNSYLVANIA EASTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2010 | Jun 30 2011 | Jun 30 2012 | Jun 30 2013 | Jun 30 2014 | Jun 30 2015 | | |
| **Overall Caseload Statistics** | | Filings ¹ | 54,140 | 48,942 | 37,983 | 11,723 | 12,080 | 10,596 | **U.S.** | **Circuit** |
| | | Terminations | 68,591 | 61,608 | 46,553 | 16,714 | 12,198 | 13,333 | | |
| | | Pending | 40,553 | 25,901 | 16,726 | 11,415 | 11,326 | 8,592 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -80.4 | -78.3 | -72.1 | -9.6 | -12.3 | | 81 | 5 |
| | | Number of Judgeships | 22 | 22 | 22 | 22 | 22 | 22 | | |
| | | Vacant Judgeship Months ² | 12.0 | 27.8 | 45.3 | 73.3 | 66.8 | 41.5 | | |
| **Actions per Judgeship** | **Filings** | Total | 2,461 | 2,225 | 1,727 | 533 | 549 | 482 | 44 | 3 |
| | | Civil | 2,399 | 2,164 | 1,668 | 476 | 501 | 431 | 28 | 3 |
| | | Criminal Felony | 47 | 46 | 43 | 40 | 32 | 33 | 90 | 5 |
| | | Supervised Release Hearings | 15 | 15 | 16 | 17 | 16 | 18 | 71 | 1 |
| | Pending Cases | | 1,843 | 1,177 | 760 | 519 | 515 | 391 | 62 | 5 |
| | Weighted Filings ² | | 375 | 420 | 403 | 411 | 407 | 393 | 55 | 4 |
| | Terminations | | 3,118 | 2,800 | 2,116 | 760 | 554 | 606 | 19 | 1 |
| | Trials Completed | | 20 | 15 | 15 | 17 | 12 | 13 | 69 | 5 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 13.7 | 13.7 | 15.7 | 14.9 | 16.1 | 14.5 | 82 | 5 |
| | | Civil ² | 8.0 | 3.1 | 1.5 | 15.1 | 4.0 | 5.5 | 6 | 1 |
| | From Filing to Trial ² (Civil Only) | | 20.8 | 20.2 | 20.0 | 19.2 | 21.6 | 24.5 | 27 | 1 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old ² | | 8,195 21.1 | 5,965 24.6 | 3,720 24.7 | 786 8.0 | 2,269 23.0 | 1,331 18.6 | 87 | 5 |
| | Average Number of Felony Defendants Filed per Case | | 1.5 | 1.5 | 1.4 | 1.4 | 1.3 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 70.8 | 74.5 | 55.2 | 80.3 | 76.8 | 61.3 | | |
| | | Percent Not Selected or Challenged | 37.0 | 37.6 | 23.3 | 37.6 | 42.1 | 30.2 | | |

| 2015 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 9,473 | 448 | 2,538 | 1,221 | 6 | 88 | 443 | 886 | 891 | 302 | 1,506 | 54 | 1,090 |
| Criminal ¹ | 723 | 2 | 194 | 54 | 90 | 180 | 59 | 50 | 10 | 22 | 14 | 9 | 39 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

¹ Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

² See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**CALIFORNIA CENTRAL**

| | | | Jun 30 2010 | Jun 30 2011 | Jun 30 2012 | Jun 30 2013 | Jun 30 2014 | Jun 30 2015 | U.S. | Circuit |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 12-Month Periods Ending | | | | Numerical Standing Within | |
| **Overall Caseload Statistics** | Filings [1] | | 16,986 | 17,690 | 18,232 | 17,464 | 16,952 | 16,275 | | |
| | Terminations | | 17,026 | 17,359 | 18,232 | 17,990 | 17,015 | 16,913 | | |
| | Pending | | 13,745 | 13,996 | 13,930 | 13,384 | 13,243 | 12,453 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -4.2 | -8.0 | -10.7 | -6.8 | -4.0 | | 55 | 5 |
| | Number of Judgeships | | 28 | 28 | 28 | 28 | 28 | 28 | | |
| | Vacant Judgeship Months [2] | | 35.7 | 21.3 | 25.9 | 9.4 | 3.6 | 11.6 | | |
| **Actions per Judgeship** | **Filings** | Total | 607 | 632 | 651 | 624 | 605 | 581 | 24 | 4 |
| | | Civil | 494 | 533 | 557 | 533 | 521 | 511 | 12 | 2 |
| | | Criminal Felony | 72 | 70 | 67 | 60 | 51 | 38 | 83 | 14 |
| | | Supervised Release Hearings | 41 | 29 | 27 | 30 | 33 | 32 | 43 | 11 |
| | Pending Cases | | 491 | 500 | 498 | 478 | 473 | 445 | 51 | 7 |
| | Weighted Filings [2] | | 609 | 639 | 668 | 667 | 669 | 655 | 11 | 2 |
| | Terminations | | 608 | 620 | 651 | 643 | 608 | 604 | 21 | 4 |
| | Trials Completed | | 13 | 13 | 13 | 14 | 14 | 14 | 62 | 8 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 10.8 | 11.0 | 10.4 | 10.8 | 13.5 | 14.2 | 80 | 13 |
| | | Civil [2] | 5.6 | 5.7 | 5.3 | 5.6 | 5.6 | 5.5 | 6 | 1 |
| | From Filing to Trial [2] (Civil Only) | | 20.4 | 19.3 | 19.5 | 19.3 | 21.3 | 19.8 | 9 | 2 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 852 8.3 | 754 7.1 | 593 5.5 | 787 7.6 | 612 5.9 | 573 5.8 | 46 | 4 |
| | Average Number of Felony Defendants Filed per Case | | 1.5 | 1.7 | 1.5 | 1.6 | 1.7 | 1.6 | | |
| | Jurors | Avg. Present for Jury Selection | 62.2 | 50.9 | 50.9 | 44.8 | 39.3 | 41.8 | | |
| | | Percent Not Selected or Challenged | 59.9 | 50.0 | 48.7 | 44.8 | 41.2 | 41.0 | | |

| 2015 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 14,320 | 1,046 | 380 | 2,131 | 95 | 1,111 | 876 | 1,599 | 684 | 1,398 | 2,591 | 14 | 2,395 |
| Criminal [1] | 1,050 | 10 | 343 | 143 | 48 | 231 | 33 | 54 | 19 | 51 | 19 | 25 | 74 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

# Explanation of Selected Terms

**Number of Judgeships**
The number of appeals and district court judgeships reflects the number of authorized federal judgeships approved by Congress.

**Vacant Judgeship Months**
Vacant judgeship months are the total number of months that vacancies occurred in any judgeship position in a circuit or district. On September 30, 2014, a total of 50 vacancies existed in the district courts, and 6 vacancies existed in the U.S. courts of appeals (excluding the U.S. Court of Appeals for the Federal Circuit).

Court profiles for both the courts of appeals and district courts reflect only caseloads for judges within the circuit/district; the profiles do not address judges' activity when visiting other circuits/districts. Detailed data on visiting judges can be found in Tables V-1 and V-2 of *Judicial Business of the United States Courts.*

**Applications for Interlocutory Appeals**
In 2012, this category was expanded to include applications for permission to appeal under 28 U.S.C. § 1292(b); appeals from district courts' orders granting or denying motions to remand class actions to the state courts under 28 U.S.C. § 1453(c); applications for permission to file direct appeals from bankruptcy court orders under 28 U.S.C. § 158(d); appeals from orders granting or denying class action certification under Fed. R. Civ. P. 23(f); and various miscellaneous proceedings.

**Supervised Release Hearings**
Beginning with *2002 Federal Court Management Statistics,* data on hearings on violations of conditions of supervision are included in the district court profiles. These hearings, which are conducted when defendants violate the terms of supervised release or probation, can result in the modification of conditions or the revocation of supervision. In addition to providing data for the category of supervised release hearings filed per authorized judgeship, data on these hearings are included in the totals for overall filings and terminations, filings and terminations per authorized judgeship, and weighted filings per authorized judgeship. These changes to the district court profiles were approved by the Judicial Conference Subcommittee on Judicial Statistics.

**Weighted Filings**
Weighted filings statistics account for the different amounts of time district judges require to resolve various types of civil and criminal actions. The Federal Judiciary has employed techniques for assigning weights to cases since 1946. In 2004, the Judicial Resources Committee of the Judicial Conference of the United States approved a civil and criminal case weighting system proposed by the Federal Judicial Center. On a national basis, weighted filings did not change significantly after the implementation of the new case weights. More than two-thirds of all district courts saw their weighted filings change by 10 percent or less. Average civil cases or criminal defendants each receive a weight of approximately 1.0; for more time-consuming cases, higher weights are assessed (e.g., a death-penalty habeas corpus case is assigned a weight of 12.89); and cases demanding relatively little time from judges receive lower weights (e.g., an overpayment and recovery cost case involving a defaulted student loan is assigned a weight of 0.10).

For comparative analysis in this report, the totals for weighted civil and criminal filings for prior years have been revised based on the new case weighting system. The weighted totals for criminal defendants include transfers but exclude reopenings. Data on civil cases arising by reopening, remand, and transfer to the

district by order of the Judicial Panel on Multidistrict Litigation are not included among the totals for weighted filings.

## Median Times

The median times are based on the amount of time elapsed from the date a case was filed to the date of its disposition for the middle case in a series containing an odd number, or the number midway between the two middle cases in a series containing an even number, when the cases are arrayed from least to the most time elapsed.

- ### Criminal Felony
  For criminal felony defendants, median time intervals are calculated using the period from the proceeding date for a defendant (e.g., the date an indictment or information was filed) to the date on which the defendant was found not guilty or was sentenced. Prior to March 2012, the median time interval was computed beginning with the defendant's filing date.  Therefore, data for March 2012 and thereafter are not comparable to data for previous periods.

- ### Civil
  For civil cases, median time intervals are calculated using the period from the date a case was filed to the date of its disposition. Median times from filing to disposition reflect all terminated civil cases, regardless of whether they were disposed of by trial or some other method. Civil median times exclude data for civil cases involving land condemnation, prisoner petitions, deportation reviews, recovery of overpayments, and enforcements of judgments. Because courts can quickly process cases involving the recovery of overpayments (which primarily address veterans' benefits) and enforcements of judgments (which primarily address student loans), including data on these cases would shorten the civil median times for some courts to the point of giving an inaccurate impression of the time usually required to process a case in the federal courts.

- ### From Filing to Trial (Civil Only)
  For civil cases, median times from filing to trial are computed using the period from the date a case was filed to the date trial began. For any reopened civil case resulting in a second completed trial, the median time is based on the case's original filing date and the date the trial was completed.

## Civil Cases Over Three Years Old

Data for cases pending more than three years may not match those presented in the Civil Justice Reform Act (CJRA) reports because the profiles presented herein include data for cases on appeal in other courts (i.e., the Supreme Court, courts of appeals, other district courts, and state courts), whereas the CJRA reporting guidelines exclude such data.

## Civil and Criminal Felony Filings by Nature of Suit and Offense

Prior to 2005, alphabetical codes corresponded to different offenses and natures of suit. Therefore, data for 2005 and thereafter are not comparable to data for earlier years. Beginning in March 2012, criminal data count defendants rather than cases and will not match previously published numbers.